**UNITED STATES of America,
Appellant,**

**v.**

**Ryan CANFIELD, Defendant–Appellee.**

**Docket No. 99–1527**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 10, 2000

Decided: May 17, 2000

Nancy V. Gifford, Assistant United States Attorney, District of Connecticut, New Haven, CT (Stephen C. Robinson, United States Attorney, Anthony E. Kaplan, Assistant United States Attorney, District of Connecticut, New Haven, CT, of counsel), for Appellant.

Terence S. Ward, Assistant Federal Public Defender, Hartford, CT (Thomas G.

Dennis, Federal Public Defender, Hartford, CT, of counsel), for Appellee.

Before: MESKILL, WALKER and CALABRESI, Circuit Judges.

MESKILL, Circuit Judge:

The government appeals the order of the United States District Court for the District of Connecticut suppressing evidence obtained against defendant-appellee Ryan Canfield. After holding a hearing, the district court identified erroneous statements and omissions in the affidavit in support of the search warrant and concluded, based on the totality of the circumstances, that the remaining portions of the search warrant lacked probable cause. Upon review of the affidavit, we hold that any inaccuracies were not material to the probable cause determination. We vacate the suppression order and remand to the district court.

## BACKGROUND

On February 22, 1999, Meriden Police Detective Salafia received an unsolicited tip that Canfield was manufacturing counterfeit United States currency. Detective Salafia alerted Special Agent Ornato of the United States Secret Service and, after some independent investigation, they drafted an affidavit in order to obtain a search warrant to search Canfield's father's house, located at 37 Carey Avenue in Meriden, Connecticut. Except as noted below, the affidavit contains the relevant facts for this appeal. It stated, in pertinent part:

3. That on 02/22/99 a Concerned/Confidential Witness came to the Meriden Police Department to speak to Det. Sgt. Dickson. That at this time this witness stated that a Ryan Canfield was manufacturing counterfeit U.S. currency. That at this time the witness produced two sheets of paper with three twenty dollar bills on each piece. That information was obtained from this person that Ryan Canfield was producing this U.S.

currency at his fathers' [sic] house at 37 Carey Ave., Meriden, Connecticut. That other information was obtained that this U.S. Currency was being manufactured on a computer, printer and a copier.

4. That information was also obtained that there are four to five males and one female involved in this and also narcotics. That this witness also stated that these individuals have narcotics present while they are manufacturing the U.S. currency. That according to this witness narcotics like acid, mushrooms, and ecstasy are present during the manufacturing of the counterfeit U.S. currency.

5. That on 02/23/99 this Confidential/Concerned Witness was interviewed to obtain more information concerning the manufacturing of U.S. Currency. The witness observed numerous sheets of money that were continuously being printed off the computer/copier over a long period of time on 02/21/99. That this witness overheard conversations that the individuals involved would be taking the counterfeit U.S. currency to Rhode Island and Boston. That according to the witness Ryan Canfield does not stay at 37 Carey Ave. but lives at 1175 Hanover Avenue, Meriden, Connecticut. The witness has knowledge of Ryan Canfield bringing narcotics and counterfeit U.S. currency back and forth from 37 Carey Ave. and 1175 Hanover Ave. Meriden, Connecticut.

6. That during this investigation this affiant spoke to Det. Trevor Thorpe concerning Ryan Canfield. That Det. Thorpe is involved in an ongoing investigation as of right now concerning drugs and the fact that Ryan Canfield is selling drugs. That Det. Thorpe then filled these affiants in as far as his investigation. That in fact he knows that Ryan Canfield is going to 37 Carey Ave. where his father lives. That Det. Thorpe obtained information from a reliable informant that Ryan Canfield is keeping drugs inside of 37 Carey Ave.

and 1175 Hanover Ave. That his investigation revealed that Ryan Canfield is selling drugs out of 1175 Hanover Ave. That this reliable informant also told Det. Thorpe that there is a stolen Saab behind the house that Ryan Canfield lives at, which is 1175 Hanover Ave. 7. That these affiants along with Det. Trevor Thorpe proceeded to both locations 37 Carey Ave. and 1175 Hanover Ave. That at 1175 Hanover Ave. there are two Saabs behind the house that appear to be in the process of being stripped. That these affiants corroborated the fact that 1175 Hanover Ave. is the address that Ryan Canfield receives mail by police in-house records and Department of Motor Vehicle records.

On February 23, 1999, Detective Salafia and Special Agent Ornato presented the affidavit to the Honorable Ronald J. Fracasse of the Connecticut Superior Court. Judge Fracasse signed the search warrant authorizing law enforcement officers to search 37 Carey Avenue and Canfield for counterfeit U.S. currency, paper, ink, computer equipment, records and any other equipment used to manufacture counterfeit U.S. currency. On February 24, 1999, the search took place. Among the items recovered from 37 Carey Avenue were a laptop computer, a color printer, a scanner, rubber gloves and a black backpack containing $2,930 in counterfeit U.S. currency. Canfield was later arrested and indicted on one count of counterfeiting U.S. currency in violation of 18 U.S.C. § 471.

On May 25, 1999, Canfield filed a motion to suppress the evidence obtained pursuant to the search warrant. Canfield also sought to suppress statements he made after the search. When the government decided that it would not introduce the statements, Canfield withdrew that portion of his motion. In the supporting memorandum, Canfield claimed that the affidavit was misleading in three respects. First, the Saab described by the second "reliable informant" (CI–2) in paragraphs 6 and 7 was not stolen. Second, Canfield's residence at 1175 Hanover Avenue (not the searched premises) was not a "house," but an apartment building. Third, the "Concerned/Confidential witness" (CI–1) had a criminal record. Based on these inaccuracies, he argued that the search warrant lacked probable cause.

On July 19, 1999, the district court held a hearing on the matter. Two witnesses were called. The first, Ms. Darcey Beausoleil, an investigator with the Federal Public Defender's Office, testified that she had been to 1175 Hanover Avenue and that it was an apartment building with six units. She produced pictures of the building indicating that there were multiple units. Next, Special Agent Ornato testified that he was aware of CI–1's criminal background, but that it did not contain any perjury or false statement convictions and that it did not have a bearing on CI–1's veracity. He also testified that he did not check to see whether the Saab behind 1175 Hanover Avenue was stolen because he did not want to compromise the investigation by inspecting the vehicle's identification number, which would have been necessary because it did not have any license plates. Further, he did not think it was relevant.

At the conclusion of the hearing, the district court ruled orally that the evidence would be suppressed. The court observed that "neither informant has any history of past reliability with the investigating officers, so it comes down to what can be corroborated." The district court made six findings: (1) the affidavit was unclear as to whether the sheets produced by CI–1 were actually counterfeit, (2) CI–1 did not provide a description of the building at 37 Carey Avenue for purposes of corroboration, (3) CI–1 provided no detail as to the counterfeit manufacturing process, (4) CI–2 did not corroborate CI–1, (5) there was no corroboration of CI–2's assertion that Canfield's father lived at 37 Carey Avenue, and (6) the affiants did not corroborate CI–2's assertion that the Saab was indeed stolen, when a simple check with the Mo-

tor Vehicle Department would have determined that Canfield owned a Saab. The district court concluded that probable cause was lacking based on the "totality of the circumstances." On July 30, 1999, the government filed a motion to reconsider the ruling. In the supporting memorandum, the government argued that ·the court failed to give deference to the issuing judge's determination of probable · cause, that the six findings of the district court were erroneous, and that the district court failed to consider the good faith exception to the exclusionary rule. On August 9, 1999, the district court granted the motion for reconsideration, but ruled that "[t]he court's conclusion has not changed." The government filed a timely notice of appeal and a certification pursuant to 18 U.S.C. § 3731 that the appeal is ·not taken for purposes of delay and that the evidence is substantial proof of facts material in the proceedings. Canfield is currently at liberty.

## DISCUSSION

The government presents the following arguments on appeal. First, there were no inaccuracies in the affidavit and that the district court erroneously reviewed the warrant *de novo*. Even if there were inaccuracies in the affidavit, they were not material to the probable cause determination. Finally, even if probable cause is found lacking, the evidence should not be suppressed because of the good-faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). Canfield responds that the district court properly reviewed the warrant *de novo* after correcting the affidavit to account for erroneous information and that the remaining portions are insufficient to support probable cause. He argues that the good-faith exception is inapplicable and that the evidence was properly suppressed. Finally, he argues that, should we disagree with his position, remand, not reversal,. is the proper disposition of this appeal.

## I. Standard of Review

■ We agree· with the district court that the affidavit submitted to Judge Fracasse contained inaccuracies. We focus on the government's second argument regarding the materiality of the allegedly erroneous information. "Whether the untainted portions [of the affidavit] suffice to support a probable cause finding is a legal question, and we review the district court's ruling on that question *de novo*." *United States v. Nanni*, 59 F.3d 1425, 1433 (2d Cir.1995); *see also United States v. Smith*, 9 F.3d 1007, 1011 (2d Cir.1993) (We "analyze *de novo* the ultimate determination of such legal issues as probable cause."). In this situation, the issuing judge's probable cause determination is not due any deference because he did not have an opportunity to assess the affidavit without the inaccuracies. The district court did not make any findings regarding the credibility of the affiants. Thus, we only need to determine whether, after putting aside erroneous information and material omissions, the affidavit supports probable cause. We conclude that it does. Therefore, we need not reach the issue of the good-faith exception to the exclusionary rule.

## II. Legal Standards

### A. Treatment of Inaccurate Information

■ A defendant is permitted to challenge the veracity of. a search warrant in limited circumstances. One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information. *See Franks v. Delaware*, 438 U.S. 154, 164–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). However, "[e]very statement in a warrant affidavit does not have to be true." *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir.1997). To suppress evidence obtained pursuant to an affidavit containing erroneous information, the defendant must show that: "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood

or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding." *United States v. Salameh,* 152 F.3d 88, 113 (2d Cir.1998); *see Trzaska,* 111 F.3d at 1027–28 (applying standard after district court conducted *Franks* hearing).

■ To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.,* material, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *Id.* If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate. As with the inclusion of false information, "[o]missions from an affidavit that are claimed to be material are governed by the same rules." *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.1985). The ultimate inquiry is whether, after putting aside erroneous information and material omissions, "there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* at 849.

### B. *Probable Cause*

■ Once the inaccurate information has been removed from the affidavit, the remaining portions of the affidavit should be reviewed *de novo* to determine if probable cause still exists. The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When the affidavit in support of the search warrant is based on information obtained from a confidential informant, "courts assess the information by examining the 'totality of the circumstances' bearing upon its reliability." *Smith,* 9 F.3d at 1012 (quoting *Illinois v. Gates,* 462 U.S. 213, 230–31, 103

S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Probable cause is "a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ..., including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317 (internal quotation marks omitted). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232, 103 S.Ct. 2317. Although discredited as a rigid two-pronged test, an informant's basis of knowledge and veracity remain important factors in a "totality of the circumstances" analysis. *See id.* at 230–39, 103 S.Ct. 2317.

### III. *The Materiality of the Alleged Inaccuracies in the Probable Cause Determination*

#### A. *Correcting the Affidavit For Alleged Inaccuracies*

Applying the standards discussed above, our first task is to correct the affidavit to account for the alleged inaccuracies. Canfield alleges three inaccuracies with the affidavit. First, he claims that the Saab referenced in paragraphs 6 and 7 was not stolen. Second, he claims that 1175 Hanover Avenue was not a house, but an apartment building. Third, he claims that the affidavit should have included CI–1's criminal record. Because we ultimately decide that these inaccuracies are not material to the probable cause determination, we need not decide whether they are actually erroneous or whether they were the result of the affiant's "reckless disregard for the truth." We note, however, that there were two Saabs behind 1175 Hanover Avenue and that Canfield was only able to produce the title to one of them, although he did swear, in an affidavit, that he owned the other. Although we believe that the terminology used to refer to the residence is largely irrelevant, we will ac-

cept that 1175 Hanover Avenue is an apartment building. The district court referred to the residence as an "apartment house." Also, the apartment building was not the place to be searched. Finally, as to CI–1's criminal record, we note that the affiants may have had valid reasons for not including this information. First, Special Agent Ornato provided undisputed testimony before the district court that CI–1's criminal record did not involve perjury or untruthfulness. The district court did not make any credibility findings regarding the testimony and we have no reason to suspect that it was untruthful. Second, given the likelihood that few people had access to the counterfeiting operations at 37 Carey Avenue, inclusion of CI–1's criminal record could have compromised his/her anonymity. *See Rivera v. United States*, 928 F.2d 592, 604–05 (2d Cir.1991) ("[L]aw enforcement agents ... may properly exclude information that would unduly risk revealing a confidential informant's identity and exposing him or her to harm."). Nevertheless, we must make the necessary corrections to see if what remains supports probable cause.

### B. *The Corrected Affidavit Supports Probable Cause*

■ Our next step is to determine whether the corrected affidavit—with the description of the Saab as stolen deleted, the description of 1175 Hanover Avenue deleted, and with CI–1's criminal record revealed—nonetheless supports probable cause. If it does, the warrant was properly issued and the evidence should not be suppressed.

■ We begin our probable cause analysis with CI–1's basis of knowledge. Canfield argues that the affidavit does not state that CI–1 actually saw the money being produced and allows for the impression that CI–1 was given the printed money somewhere outside of the apartment. We do not accept Canfield's cramped reading of the affidavit. The relevant sentence appears in paragraph 5 and reads: "The

witness observed numerous sheets of money that were continuously being printed off the computer/copier over a long period of time." Courts have repeatedly been warned not to "interpret[ ] the affidavit in a hypertechnical, rather than a common-sense, manner." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). We are also mindful that affidavits "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *Id.* at 108, 85 S.Ct. 741. We are confident that, reading the affidavit as a whole and the particular sentence highlighted by Canfield in a common-sense manner, CI–1 actually saw the money "being printed off the computer/copier." Other facts in the affidavit—that CI–1 produced two sheets of counterfeit money, that CI–1 was aware of the presence of drugs "while they are manufacturing the U.S. currency," that CI–1 overheard conversations regarding the disposition of the counterfeit money, and that CI–1 saw the manufacturing equipment—demonstrate that CI–1 was present at 37 Carey Avenue and had firsthand knowledge of the counterfeiting. We are satisfied that CI–1 had a sufficient basis of knowledge.

■ Canfield next argues that CI–1's information lacks veracity, in part because CI–1 does not have a proven track record with the police. However, "it is improper to discount an informant's information simply because he has no proven record of truthfulness or accuracy." *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir.1993) (citing *Gates*, 462 U.S. at 237–38, 103 S.Ct. 2317). Here, CI–1's veracity can be shown in other ways. First, CI–1's veracity is helped by the manner in which the tip was delivered. "[A] face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false." *United States v. Salazar*, 945 F.2d 47, 50–51 (2d Cir.1991). Also, "if an informant's dec-

laration is corroborated in material respects, the entire account may be credited, including parts without corroboration." *Wagner,* 989 F.2d at 73.

■ The district court found that CI–1's information could not be corroborated. We disagree. Corroboration requires an "assessment of probabilities." *E. g., Gates,* 462 U.S. at 232, 103 S.Ct. 2317. CI–1 was in possession of sheets of counterfeit money, which was strong evidence to corroborate the assertions of counterfeiting. Whether the bills came from Canfield was not corroborated. We need, therefore, to look to see if other facts asserted by CI–1 were corroborated. Even if these are innocent details, we look to these other facts, because if CI–1 was truthful about some part of the story, there is a higher probability the incriminating facts are true, including the existence of a counterfeiting operation at 37 Carey Avenue. *See Gates,* 462 U.S. at 244 n. 13, 103 S.Ct. 2317 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause."). Besides describing the counterfeit operation, CI–1 asserted that Canfield did not live at 37 Carey Avenue, but instead commuted back and forth from his residence at 1175 Hanover Avenue. CI–1 also stated that Canfield was involved with narcotics. These facts were corroborated by Detective Thorpe and CI–2. Detective Thorpe was involved in an ongoing narcotics investigation of Canfield and knew of Canfield's movements. CI–2 was also aware of Canfield's narcotics activity and his movements between the two addresses. The corroboration of Canfield's narcotics activity and movements indicates that CI–1 was truthful as to these details. We believe that this corroboration made it sufficiently likely that CI–1 was truthful about the counterfeiting operation at 37 Carey Avenue to demonstrate CI–1's veracity.

■ Although Detective Thorpe's corroboration of CI–1's statements was sufficient to demonstrate CI–1's veracity, we examine CI–2's corroboration of CI–1 to show the limited effect of the alleged inaccuracies. To assess the veracity of CI–2 and whether CI–2 can corroborate CI–1, we look to see what statements of CI–2 can be corroborated. CI–2 asserted that there was a "stolen Saab behind [Canfield's] house." If we delete the allegedly erroneous assertions, what remains is CI–2's knowledge of a Saab behind the residence. This was corroborated by the affiants' independent investigation at 1175 Hanover Avenue. The specific reference to the Saab demonstrates that CI–2 had been to the address and knew where Canfield lived. Further, even if the Saab was not stolen, it is not disputed that it had no license plates and was partially stripped, circumstances not inconsistent with having been stolen. In any event, the search warrant was sought to find evidence of counterfeiting, not auto theft. Given that CI–2 was also aware of Canfield's narcotics activities and movements between addresses, corroborated by Detective Thorpe, CI–2's statements appear to be truthful. Simply because CI–2 was incorrect about who owned the Saab does not to any great extent undermine the believability of CI–2's other statements. *See Smith,* 9 F.3d at 1014 ("[P]robable cause is not defeated because the informant erred, or even lied, in his description of events.").

We have reviewed CI–1's criminal history, filed under seal with the district court, and we conclude that it does not impeach CI–1's veracity. Further, the corroboration of significant portions of CI–1's statements demonstrates that CI–1 was truthful in this instance, regardless of CI–1's criminal past.

We need not discuss the district court's individual findings because our disagreement is centered on the legal determination of whether the corrected affidavit supports probable cause. The district court apparently believed that, once the inaccurate information was corrected, CI–2 did not corroborate CI–1, defeating probable cause. As discussed above, we believe

that sufficient corroboration existed. CI–1's statements regarding Canfield's movements and drug activity were corroborated by Detective Thorpe and CI–2. We do not believe that CI–1's criminal history reflects on his/her veracity or that the inaccuracies otherwise taint the unchallenged portions of the affidavit. Because the corrected affidavit supports probable cause, the alleged inaccuracies were not material to the probable cause determination and the evidence should not have been suppressed.

 Finally, Canfield argues that remand, not reversal, is the appropriate disposition of this appeal. We disagree. Because our decision is based on the legal determination of probable cause, an issue that we review *de novo*, remand on this issue is unnecessary. Further factual development is not necessary as we have a more than sufficient record on which to base our decision.

## CONCLUSION

Pursuant to *Franks*, we have corrected the affidavit in support of the search warrant for allegedly erroneous material and allowed for omissions. After making these corrections, we conclude that the affidavit supported probable cause to issue the warrant. Thus, the claimed inaccuracies and omissions were not material to the probable cause determination. We vacate the district court's order suppressing the evidence and remand for proceedings not inconsistent with this opinion.