**UNITED STATES of America,**
**Appellee,**

v.

**Joseph MARTIN, Defendant–Appellant.**

**Docket Nos. 04–1600 CR(L),**
**04–2344 CR(CON).**

United States Court of Appeals,
Second Circuit.

Argued: Nov. 9, 2004.

Decided: Aug. 4, 2005.

Steven Jay Harfenist, Friedman, Harfenist, Langer & Kraut, Lake Success, NY, for Defendant–Appellant.

Bonnie S. Klapper, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Cecil C. Scott, Assistant United States Attorney, on the brief), Brooklyn, NY, for Appellee.

Before: WALKER, Chief Judge,
POOLER and WESLEY, Circuit Judges.

Judge POOLER dissents in a separate opinion.

JOHN M. WALKER, JR., Chief Judge.

Defendant-appellant Joseph Martin appeals from the March 19, 2004, amended judgment of the United States District Court for the Eastern District of New York (Leonard D. Wexler, *Judge* ), convicting him, after his guilty plea, of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), and sentencing him principally to a term of imprisonment of twenty-seven months. On this appeal, Martin challenges the district court's May 15, 2003, memorandum and order denying his motion to suppress evidence seized from his home pursuant to a search warrant.

The search arose out of "Operation Candyman," an extensive government investigation of persons suspected of collecting and distributing child pornography over the internet. Most of the searches conducted in Operation Candyman were pursuant to warrants supported by affidavits, each of which recounted the same investigative findings by the same FBI agent but contained additional facts specific to the particular search. Subsequent to the issuance of the warrant in this case, the supporting affidavit was determined to contain misstatements about general investigative facts. Like many defendants in these Candyman cases, Martin moved to suppress the fruits of the search. Because the affidavit, even without these false statements, supports a finding of probable cause, we affirm the district court's denial of the suppression motion.

Martin, however, was sentenced under the mandatory Guidelines regime existing

prior to *United States v. Booker,* 543 U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). We, therefore, remand the case to the district court for further proceedings consistent with *Booker* and *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005).

## BACKGROUND

### I. *The Supporting Affidavit*

The Martin affidavit covered the search of different premises and contained facts pertaining to three separate child-pornography e-groups:[1] "Candyman," as well as "girls12–16" and "shangri_la." The portions relevant to Martin's home, and this appeal, alleged that an individual residing there was only a member of girls12–16. But the affidavit incorporated the following description of the Candyman e-group and its features into its general discussion of the girls12–16 e-group.

### A. *Operation Candyman*

In January 2001, FBI Special Agent Geoffrey S. Binney joined the Candyman e-group in an undercover capacity. The Candyman webpage announced the following to anyone considering joining:

> This group is for People who love kids. You can post any type of messages you like too [sic] or any type of pics or vids you like too [sic]. P.S. IF WE ALL WORK TOGETHER WE WILL HAVE THE BEST GROUP ON THE NET.

In order to use the full website, an individual was required to become a member of the e-group.

Special Agent Binney's affidavit went on to assert that members had access to a number of features on the website: (1) a

"Files" section allowed users to post images and video clips for other members to access and download; (2) a "Polls" section "allowed Candyman E-group members to answer survey questions, such as 'what age group do you prefer?' "; (3) a "Links" section permitted members "to post URLs for other web sites containing similar content"; (4) a "Chat" section enabled members "to engage in real time chat conversations with each other"; (5) an e-mail list, to which all new members were automatically[2] added, circulated messages and files when they were sent to the e-group; and (6) a "Messages" area stored all the messages and files transmitted to the group so that members could review them later. *See generally United States v. Froman,* 355 F.3d 882, 884–85 (5th Cir.2004) (describing features of Candyman website).

In the "Files" section, Special Agent Binney found and downloaded approximately 100 pictures and movies of child pornography and so-called child erotica. From January 2, 2001, when Binney joined the Candyman e-group, until February 6, 2001, when the e-group was shut down, he received nearly 500 e-mails, to which were attached roughly 300 files containing child pornography or child erotica.

After the warrant authorizing the search of Martin's home was issued, misstatements were discovered in the standard provisions of the affidavit. The affidavit declared that every new member was automatically added to an e-mail list and thereafter "automatically received every e-mail message and other file transmitted to the Candyman E-group by any Candyman E-group member." It was later revealed that this statement was not universally

---

1. An e-group is an internet forum through which persons with similar interests can interact by e-mail and online "chat," and by posting messages, pictures, and videos to the group's website.

2. As discussed infra, the government later admitted that this statement was false.

true. Those who registered by e-mail were automatically added to the e-mail list, but those who registered on the Candyman website could opt out of this feature.

### B. *Girls12–16 E-group*

During the course of the Candyman investigation, the FBI also observed that some Candyman members had begun to exchange information about two new e-groups: "girls12–16" and "shangri_la," both of which also focused on child pornography. The girls12–16 e-group—central to Martin's appeal—included the following welcome message:

> Hi all, This group is for all those ho [sic] appreciate the young female in here [sic] finest form. Watching her develop and grow is like poetry in motion [sic], to an age where she takes an interest in the joys and pleasures of sex. There is probably nothing more stimulating than watching a young teen girl discover the pleasures of the orgasm. The joy of feeling like she is actually coming into womanhood. It's an age where they have no preconditions about anything, just pure opennes [sic]. What a joy to be a part of that wonderful experience and to watch the development of this perfect form. This is the place to be if you love 11 to 16 yr olds. You can share experiences with others, share your views and opinions quite freely without censorship. You can share all kinds of other information as well regarding—your current model: if you are a photographer. Where the best place to meet gitls [sic] is. The difficulties you experience in your quest. The best way to chat up. Good places to pick girls up.

> Girls you would like to share with others. The choice is all yours. Welcome home! Post videos and photographs . . . and how about your true life experiences with them so that other viewers can paint a mental picture andin [sic] some ways share the experience with you. You could connect with others from the same country as you and get together sociall [sic] if you wish. The choice is all yours. How about a model resource for photographers? It's all up to you and is only limited by your own imaginations. Membership is open to anyone, but you will need to post something. Mybe [sic] a little bit about yourself/what your interests are (specifically), your age, location . . . and a pic or vid would be a good to [sic]. By doing this other members (or potential members) with the same interest may then contact you if you wish them to.

The shangri_la e-group welcome message simply announced, "Hardcore Only." These two e-groups had "many of the same features as the Candyman E-group,"[3] and they also offered membership lists setting forth each member's Yahoo! user identification, his truncated e-mail address, and the date each member joined the group.

The girls12–16 membership list included a member whose email address (Joeym@optonline.net) was ultimately found to be associated with an individual living at Martin's house. The affidavit did not allege that Joeym@optonline.net was additionally a member of the Candyman, but, as noted, the discussion of girls12–16 depended upon the description of the Candyman's features.

---

**3.** The affidavit did not specifically state that members of girls12–16 automatically received e-mails, but we infer from the affidavit's declaration that girls12–16 had "many of the same features as the Candyman" and from the parties' arguments that the affidavit intended to state that girls12–16 members did receive the automatic e-mails. Accordingly, the girls12–16 portion of the affidavit contained the same defect as the Candyman portion. The government's correction, therefore, applies to both e-groups.

Between February 2, 2001, and February 15, 2001, while Special Agent Binney was an undercover member of girls12–16, he received 193 e-mails, of which fourteen contained pictures of child pornography and seventy-seven contained images of child erotica.

### C. Child–Pornography Collector Computer Use and Characteristics

The affidavit also included an extensive discussion, based on the experiences of Special Agent Binney, of the way individuals who collect and produce child pornography use computers and the internet to access, acquire, and disseminate this material. It further detailed the characteristics of child-pornography collectors, drawn from the extensive experience of a special agent in the FBI's Behavioral Analysis Unit. This section emphasized that collectors tend to maintain their illicit collections and that they rarely, if ever, destroy them.

### II. Procedural History

On the basis of the affidavit, the magistrate judge issued a warrant authorizing the search of, inter alia, Martin's residence. The FBI executed the warrant and seized Martin's computer, on which hundreds of images and video clips of child pornography and child erotica were found.

Martin's indictment for violation of the federal child-pornography laws was handed up in June 2002 and unsealed a month later. In August and then in December 2002, the government wrote two letters to Martin that revealed the affidavit's misstatements about automatic e-mail delivery. As a result of the disclosure of the false statements in a separate case, *United States v. Strauser*, 247 F.Supp.2d 1135 (E.D.Mo.2003), the government informed Martin that Special Agent Binney testified at a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that he received e-mails automatically because he subscribed to the Candyman e-group by e-mail and not through the website. But an official from Yahoo!, which owned and operated the e-group service on which the Candyman operated, testified that company records indicated that Binney subscribed through the group's website and, therefore, should have known that e-mail receipt was optional.

On the basis of these disclosures, Martin moved to suppress all evidence seized from his residence and for a *Franks* hearing. Relying on his previous Candyman decision in *United States v. Coreas*, 259 F.Supp.2d 218 (E.D.N.Y.2003), Judge Wexler denied Martin's motion on May 12, 2003, stating:

Here, as in *Coreas*, the facts presented, even without the false statement, support such a finding [of probable cause]. First, the affidavit contains extensive background information regarding subscribers to groups such as the Candyman group and the proclivity of members to use such groups to collect, trade and retain images of child pornography. The affidavit further describes the Candyman group in detail. With the exception of the false statement regarding automatic e-mail receipt, all statements regarding the group and the agent's receipt of numerous images of child pornography are truthful. It is also without question that the Defendant joined the group. These facts are sufficient to establish probable cause to believe that a search of Defendant's computer would reveal evidence of criminal activity. *Accord United States v. Coplan*, No. CR 02–319(ARR) (E.D.N.Y. August 15, 2002) (holding that affidavit in Candyman investigation was sufficient to establish probable cause even without the statement regarding receipt of e-mail).

*United States v. Martin,* No. CR 02–730, slip op. at 2–3 (E.D.N.Y. Mar. 12, 2003).[4]

On September 16, 2003, Martin pleaded guilty while reserving his right to appeal the district court's suppression ruling. This appeal followed.

## DISCUSSION

### I. *The Suppression Motion*

Martin contends that, after excising the false statements, the affidavit is insufficient to make out a showing of probable cause. He argues that the district court erroneously determined that his membership in the girls12–16 e-group demonstrated probable cause, and that the district court's finding was simply premised on guilt by association. He also requests a *Franks* hearing to determine whether the false statements were made intentionally or recklessly. We agree with the government that, even without the false statements, the affidavit established probable cause.

#### A. *Applicable Law*

■ The Fourth Amendment prohibits "unreasonable searches and seizures," and the Warrants Clause mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks,* 438 U.S. at 171, 98 S.Ct. 2674. "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the valid-

ity of the warrant and the resulting search or seizure." *United States v. Awadallah,* 349 F.3d 42, 64 (2d Cir.2003). "However, every statement in a warrant affidavit does not have to be true." *United States v. Canfield,* 212 F.3d 713, 718 (2d Cir.2000) (internal quotation marks omitted).

■ In *Franks v. Delaware,* the Supreme Court held that a defendant may challenge the validity of a search warrant alleged to contain deliberately or recklessly false or misleading information. 438 U.S. at 164–72, 98 S.Ct. 2674. To void the warrant and suppress the evidence, a defendant must demonstrate, by a preponderance of the evidence, that (1) the affidavit contained "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) "the allegedly false statement is necessary to the finding of probable cause." *Id.* at 156, 98 S.Ct. 2674; *accord Canfield,* 212 F.3d at 717–18.

■ A false statement "is material when 'the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.' " *Awadallah,* 349 F.3d at 64–65 (quoting *Canfield,* 212 F.3d at 718). We have explained that we "gauge [the] materiality [of the misstatements] by a process of subtraction." *Id.* at 65.

To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.,* material, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." If the corrected affidavit supports probable cause, the inaccuracies were not material to the

---

4. The district court mistakenly refers to the e-group in question as the Candyman, not girls12–16. As noted above, the affidavit alleged that the way the websites operated was not materially different. The text of girls12–16's welcome message, however, was even more explicit about its illicit purpose.

probable cause determination and suppression is inappropriate.

*Canfield,* 212 F.3d at 718 (quoting *United States v. Trzaska,* 111 F.3d 1019, 1027–28 (2d Cir.1997)). Thus, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" *Id.* (quoting *United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir.1985)); *accord Awadallah,* 349 F.3d at 65; *Trzaska,* 111 F.3d at 1027–28.

A judge's probable-cause determination is not overly strict. Presented with a warrant application, the judge must "simply ... make a *practical, common-sense decision* whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a *fair probability* that contraband or evidence of *a* crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (emphasis added). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232, 103 S.Ct. 2317. The Supreme Court has held that probable cause does *not* require a "prima facie showing":

> Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and

not a prima facie showing, of criminal activity is the standard of probable cause."

*Id.* at 235, 103 S.Ct. 2317 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)).

"'Whether the untainted portions [of the affidavit] suffice to support a probable cause finding is a legal question, and we review the district court's ruling on that question *de novo.*'" *Canfield,* 212 F.3d at 717 (quoting *United States v. Nanni,* 59 F.3d 1425, 1433 (2d Cir.1995)); *see also United States v. Smith,* 9 F.3d 1007, 1011 (2d Cir.1993).

### B. The "Corrected" Affidavit Supports Probable Cause

■ We conclude that the affidavit, after being corrected for the error, still supports a probable-cause finding and that Judge Wexler did not err in denying the suppression motion.[5] As such, we need not reach the question of whether the misstatements were made knowingly or recklessly. *See Franks,* 438 U.S. at 156, 98 S.Ct. 2674.

The corrected affidavit provided the magistrate judge with facts sufficient for her to conclude that the overriding, if not the sole, purpose of the girls12–16 e-group was illicit (to facilitate the receipt and distribution of child pornography); that an e-mail address of a girls12–16 member was linked to Martin's house; that collectors of child pornography overwhelmingly use the internet and computers to distribute and hoard this illegal pornographic material; and that, accordingly, there was a "fair probability," given the totality of the circumstances and common sense, *Gates,* 462

---

**5.** In *United States v. Schmidt,* 373 F.3d 100, 103–04 (2d Cir.2004), this court stated, in *dicta,* that it would probably find that the corrected affidavit in a Candyman case established probable cause. Here, Martin was a member of the girls12–16 group, not the Candyman group.

U.S. at 238, 103 S.Ct. 2317, that evidence of *a* crime would be found at Martin's home because membership in the e-group reasonably implied use of the website.

First, the girls12–16's welcome message unabashedly announced that its essential purpose was to trade child pornography. All members were greeted with the explicit introduction that "[t]his group is for all those ho [sic] appreciate the young female in here [sic] finest form. Watching her develop and grow is like poetry in motion [sic], to an age where she takes an interest in the joys and pleasures of sex." It invited members to share information about their current "model" for photographers, where to meet girls, the best way to "chat them up," and "[g]irls you would like to share with others." And it made clear that members could "[p]ost videos and photographs" of girls. *See United States v. Shields*, No. 4:CR–01–0384, 2004 WL 832937, at *7 (M.D.Pa. Apr. 14, 2004) ("[T]he purpose of the 'Candyman' and 'Girls 12–16' websites clearly was to share child pornography."); *United States v. Coplan*, No. CR 02–319 (E.D.N.Y. Aug. 15, 2002) (oral decision) (same). The title of the e-group, "girls12–16," further made plain that the site's focus was on minor girls.

Second, the affidavit contained an extensive background discussion of the modus operandi of those who use computers for collecting and distributing child pornography, including their reliance on e-groups, e-mail, bulletin boards, file transfers, and online storage. *See United States v. Bailey*, 272 F.Supp.2d 822, 838 (D.Neb.2003). Third, it described the characteristics and proclivities of child-pornography collectors, specifically how they tend to collect such material, store it, and rarely destroy or discard it. *See id.; see also United States v. Harvey*, 2 F.3d 1318, 1322–23 (3d Cir. 1993) (gathering cases that state collectors

of child pornography rarely discard their collections). Fourth, girls12–16's illicit purpose could be inferred from the website's technological features (files, messages, polls, e-mail, links, polls, chat, and membership lists) that facilitated the trading of child pornography. *See Froman*, 355 F.3d at 890 & n. 5. Fifth, the agent confirmed that the material uploaded and downloaded on the girls12–16 site included child pornography and child erotica, and that this material was available to all members. *See Shields*, 2004 WL 832937, at *7. Sixth, the affidavit established a nexus between the member and the website: The girls12–16 member who utilized the e-mail address Joeym@optonline.net lived at the searched house. *See Bailey*, 272 F.Supp.2d at 838. Seventh, Joeym@optonline.net joined girls12–16 voluntarily and never cancelled his membership. *See Froman*, 355 F.3d at 890–91.

Based on the foregoing, we have no difficulty concluding that the corrected affidavit established probable cause. The affidavit included evidence that an occupant of Martin's house, Joeym@optonline.net, was a member of the girls12–16 e-group, whose raison d'être, or primary reason for existence, was the trading and collection of child pornography—a wholly illegal endeavor. It is common sense that an individual who joins such a site would more than likely download and possess such material. *See id.* (finding it to be "common sense" that one who "voluntarily joins" a child-pornography group and "remains a member of the group ... without cancelling his subscription ... would download such pornography from the website and have it in his possession"); *Bailey*, 272 F.Supp.2d at 824–25 ("[K]nowingly becoming a computer subscriber to a specialized internet site that frequently, obviously, unquestionably and sometimes automatically distributes electronic images of child pornography to other computer

subscribers alone establishes probable cause for a search of the target subscriber's computer."); *see also United States v. Coye,* No. 02–CR–732, 2004 WL 1743945, at *3 (E.D.N.Y. Aug. 4, 2004). And this conclusion is supported by the majority of courts that have found that corrected Candyman affidavits set forth probable cause. See, e.g., *Schmidt,* 373 F.3d at 103–04; *Froman,* 355 F.3d at 890–91; *Coye,* 2004 WL 1743945, at *3; *Shields,* 2004 WL 832937, at *7–*8; *Bailey,* 272 F.Supp.2d at 824–25, 838–39; *Coreas,* 259 F.Supp.2d at 220–21; *Coplan,* No. CR 02–319.

We believe that our conclusion adequately balances the need for law enforcement to have a certain amount of latitude in conducting criminal investigations with the constitutional guarantees of free association and protection against unlawful searches. It does not grant the government an unchecked license to search citizens' homes simply because they are members of an offensive or disreputable group. Rather, it recognizes that, depending on the totality of the evidence proffered in the affidavit, a substantial likelihood of criminal activity may exist if an individual is a member of an internet e-group whose purpose is unlawful. A contrary conclusion would unnecessarily hamper government investigations by fostering too restrictive a view of probable cause, and would conflict with the pragmatic, common-sense probable-cause analysis that the Supreme Court requires. *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

Ignoring the specific details of the affidavit and its fair inferences, Martin argues that the district court "merely speculat[ed]" that child pornography was being delivered and that probable cause is lacking because the corrected affidavit does not specify that he downloaded this illegal material. While the affidavit does not explicitly state that Martin accessed child pornography, it ties the girls12–16 website to an individual living in Martin's home, and states child pornography was available to all who joined and was being distributed to some of the group's members, as shown by the agent's receipt of e-mails containing illegal child pornography and his downloading other such material from the website.

The defect in Martin's argument is that he conflates evidence of probable cause to sustain a warrant with proof of a prima facie case. As noted earlier, probable cause does not require a prima facie showing that Martin possessed child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *See Gates,* 462 U.S. at 235, 103 S.Ct. 2317. Rather, because probable cause is a "common-sense" test, the corrected affidavit need only establish that there is a "fair probability that contraband or evidence of *a* crime will be found in a particular place." *Id.* at 238, 103 S.Ct. 2317 (emphasis added). The inquiry turns on an "assessment of probabilities" and inferences, not on proof of specific criminal conduct beyond a reasonable doubt or even by a preponderance of the evidence. *Id.* at 235, 103 S.Ct. 2317. Simply put, probable cause is a "relaxed standard," *United States v. Leon,* 468 U.S. 897, 958, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), not a legal determination of guilt or liability, *see Gerstein v. Pugh,* 420 U.S. 103, 121, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (noting "lesser consequences of probable cause determination"); *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (indicating that probable cause requires "less than evidence which would justify ... conviction," but "more than bare suspicion" (internal quotation marks omitted)). The redacted affidavit in this case plainly meets this common-sense threshold.[6]

6. By ignoring the difference between probable cause and a prima facie violation of 18

Although Martin contends that there were legal, as well as illegal, uses for the site, he offers no evidence to support that claim. Martin does not argue, for example, that he, or anyone else, used the e-group as a forum for debating the legalization of child pornography, or simply discussing child pornography or pedophilia. *Cf. United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985) ("The fact that an innocent explanation may be consistent with the facts alleged, however, does not negate probable cause."). Instead, he maintains that "viewing" child pornography on the internet is legal, but this is an open question. *See, e.g., United States v. Tucker*, 305 F.3d 1193, 1205 (10th Cir.2002) (finding defendant knowingly possessed child pornography, where it was saved in his computer's cache); *United States v. Perez*, 247 F.Supp.2d 459, 484 n. 12 (S.D.N.Y. 2003) (noting that question of whether 18 U.S.C. § 2252A(a)(5)(B) reaches "mere internet 'browsing' is something of an open question"). *See generally* Ty E. Howard, Don't Cache Out Your Case: Prosecuting Child Pornography Possession Laws Based on Images Located in Temporary Internet Files, 19 Berkeley Tech. L.J. 1227 (2004). There is no need to decide this question, however. Even if viewing were legal, that would not defeat probable cause because it is common sense that, in the context of this website and the corrected affidavit, those who view are likely to download and store child pornography. The concern that a person who innocently joins an organization with a mixed purpose might be subjected to an unnecessary and unconstitutional search is not present here because the girls12–16 e-group and its technological features served primarily as a *means* for effecting illegal activity. At its core, the modus operandi of the girls12–16 website was criminal, and that is determinative in this case.

Accordingly, we affirm the district court's denial of Martin's suppression motion.

## II. Crosby *Remand*

■ Following oral argument, the Supreme Court issued its decision in *United States v. Booker*. In *Booker*, the Court concluded that a district judge violates the Sixth Amendment when it finds facts and mandatorily uses them to enhance a sentence above the Guidelines range that would have been applicable based solely on facts that the jury found or that the defendant admitted. 543 U.S. ——, 125 S.Ct. at 750, 755–56. To remedy this problem, the Court severed the statutory provision that made the Guidelines mandatory, thus rendering the Guidelines "effectively advisory." *Id.*, 543 U.S. ——, 125 S.Ct. at 757.

In *United States v. Crosby*, we established the procedure this circuit would generally follow in cases where the district court erred in applying the Guidelines mandatorily, but where this procedural error was unpreserved by proper objection below. 397 F.3d at 117–18. "[W]e ruled in *Crosby* that we would normally remand for determination by the sentencing judge of whether a materially different sentence would have been imposed," had the judge known at that time that the Guidelines were advisory. *United States v. Williams*, 399 F.3d 450, 460 (2d Cir.2005).

U.S.C. § 2252A(a)(5)(B), the dissent makes the same mistake as Martin. Likewise, the dissent's focus on the presence of girls12–16's text-based functions does little to weaken the logical, common-sense inference that child pornography were being traded on the website. The text-based functions could facilitate the exchange of this illicit material just as easily as the other so-called "visual" functions. Indeed, in the context of girls12–16, one probably would engage in such an online chat to arrange to barter child pornography.

Martin requests a *Crosby* remand, and the government consents to this relief. Because the district court committed procedural error by sentencing Martin under the mandatory regime, this case is remanded to the district court for further proceedings consistent with *Booker* and *Crosby*.

Any appeal taken from the district court's decision on remand can be initiated only by filing a new notice of appeal. *See* Fed. R.App. P. 3, 4(b). A party will not waive or forfeit any appropriate argument on remand or on any appeal post-remand by not filing a petition for rehearing of this remand order.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED and the case is REMANDED pursuant to *Crosby* for consideration of whether to resentence.

POOLER, Circuit Judge, dissenting.

I respectfully conclude that today the majority announces a dangerous precedent. According to the majority, if an individual subscribes to an Internet E-group and that E-group is determined to have an illegal purpose,[7] the government has probable cause to obtain a warrant to search the subscriber's home. This is the case even when (1) an individual's e-mail address remains on the E-group subscriber list only for fourteen days and (2) there is no particularized evidence indicating that the individual visited the E-group sub-

sequent to subscription or participated in the E-group's functions in any way.

Because the majority fails to make an individualized assessment of Martin's potential involvement in illegal activities, the majority's holding runs counter to the Fourth Amendment's protection against "unreasonable searches and seizures." U.S. Const. amend. IV; *see Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In contrast to the majority, I believe that Martin satisfies the second prong of *Franks v. Delaware,* because he has demonstrated by a preponderance of the evidence that Agent Binney's "false statement [in the original affidavit] is necessary to the finding of probable cause." *See* 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Therefore, this case should be remanded to the district court to determine, under the remaining *Franks* prong, whether Agent Binney's false statements were made knowingly or recklessly. *Id.* at 155–56, 98 S.Ct. 2674. Accordingly, I must dissent.

### I. The Limited Scope of 18 U.S.C. § 2252A

One of the fundamental flaws underlying the majority's reasoning is its failure to acknowledge the limited scope of the relevant crime. The relevant crime in this case, as indicated in the corrected affidavit, is the knowing transportation, possession, receipt, distribution, or reproduction of *visual* (not textual) depictions of children engaged in sexually explicit conduct, 18 U.S.C. §§ 2252A(1)-(3), 2256(8). The statute unambiguously defines "child pornog-

---

**7.** The majority's holding is a moving target, but I believe that "illegal purpose" is a fair characterization. *See* Op. at 74 (probable cause when individual is a member of organization whose "overriding, if not [ ] sole purpose" is illegal); Op. at 75 (whose "essential purpose" is illegal); Op. at 75 (whose purpose is illicit); Op. at 75 (whose "raison d'être, or primary reason for existence" is to effectuate illegal activity); Op. at 76 (whose "purpose is unlawful"); Op. at 77 (whose functions serve "primarily as a means for effecting illegal activity"); Op. at 77 (whose "modus operandi" is criminal).

raphy" as "any *visual depiction*, including any photograph, film, video, picture, or computer or computer-generated image or picture" of, inter alia, "a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8) (emphasis added). While Section 2252A criminalizes any form of trading child pornography (hereinafter referred to as the "trading of illegal visual depictions"), it does *not* criminalize (1) the trading of textual depictions of any kind or (2) the trading of visual depictions of children that are not sexually explicit but are "sexually arousing to a given individual" (referred to in the affidavit as "child erotica").

Proper consideration of the limited scope of the relevant crime clearly demonstrates that Agent Binney's erroneous statements-that *all* subscribers to the girls12–16 E-group, including Martin, *automatically received* approximately fourteen illegal *visual* depictions during the fourteen days that Martin's e-mail was listed as a subscriber to the E-group [8]-were crucial to the determination that there was a fair probability that evidence *of a crime* would be found in Martin's home. Agent Binney's false statements provided the only basis for the inference that there was a fair probability that all E-group subscribers would possess illegal visual depictions.

## II. The Majority's Inferential Leaps

The majority reasons that, even without Agent Binney's false statements, the corrected affidavit is sufficient because it putatively establishes that (1) Martin subscribed to the E-group; (2) the "overriding, if not the sole, purpose" of the E-group was illegal; and (3) collectors of child pornography "overwhelmingly use the internet and computers to distribute and hoard this illegal pornographic material." Op. at 74.

As I will discuss below, the reasoning underlying this holding is deficient because it relies on numerous unreasonable inferences to gloss over the deficiencies in the corrected affidavit. First, the corrected affidavit does not allege facts that support an inference that Martin participated in *any* of the E-group's legal or illegal functions. Second, the corrected affidavit does not support the conclusion that the overriding purpose of the E-group was illegal. *See* Op. at 74–75. Third, the corrected affidavit's allegation that Martin was an E-group subscriber indicates only Martin's propinquity to others who were committing a crime, which is not sufficient to establish probable cause. Fourth, the corrected affidavit's allegations regarding the propensities of "collectors of child pornography" do little to establish probable cause with respect to Martin.

## A. Participation in the E-group

Based on the affidavit's allegation that Martin's e-mail address was listed as a subscriber to the E-group, the majority erroneously infers that it is likely that Martin participated in those functions of the E-group that were illegal.[9]

---

**8.** The majority downplays these crucial false statements about Martin's receipt of illegal visual depictions as relating to "general investigative facts." Op. at 69. Agent Binney's crucial statement that all subscribers automatically received e-mails containing illegal visual depictions was later proven to be entirely false. Indeed, as observed in another Candyman case, the "vast majority of subscribers ... elected *to receive no e-mails.*" *See United States v. Perez*, 247 F.Supp.2d 459, 482–83 (S.D.N.Y.2003) (emphasis added).

**9.** The majority states that "membership in the e-group reasonably implied use of the website." Op. at 75.

The text of the affidavit does not permit this inferential leap. The individualized portions of the corrected affidavit solely establish (1) that Martin's e-mail address was entered as a subscriber to the girls12–16 E-group on February 1, 2001, and (2) that Martin's e-mail remained on the subscriber list for fourteen days. The affidavit does not indicate that Martin ever searched the site's functions, received any correspondence from the E-group, or otherwise had anything to do with the E-group between February 1, 2001 and February 14, 2001.[10] E-group subscription, which requires a few simple clicks on an individual's personal computer, is simply not enough to indicate that an individual has taken an affirmative step to participate in the E-group's activities. The majority can cite no case that indicates otherwise.[11]

*B. Purpose of the E-group*

The content of the corrected affidavit does not support the majority's conclusion that the overriding purpose of the E-group was dedicated to illegal activity. Op. at 74–75. There is nothing in the corrected affidavit that alleges or otherwise establishes that the E-group was wholly or mostly dedicated to the trading of illegal *visual* depictions. While the "file posting" function of the E-group was dedicated to the activity of uploading and downloading illegal visual depictions, the affidavit lists a number of other E-group functions that were purely text-based. *See Perez,* 247 F.Supp.2d at 483 ("Subscribers could have engaged in protected, non-criminal activities, such as answering survey questions or chatting."); *see also United States v. Ku-*

*nen,* 323 F.Supp.2d 390, 400 (E.D.N.Y. 2004).

Although we may deeply disapprove of activities such as visiting chat rooms, taking online polls, and posting textual messages within the context of the girls12–16 E-group, these text-based activities are not illegal within the meaning of Section 2252A, the offense with which Martin is charged. Contrary to the majority's assertions, the corrected affidavit does not establish that these text-based functions were principally dedicated to the acquisition of illegal visual depictions. The girls12–16 E-group welcome message, which the majority quotes at length, is undoubtedly distasteful, but its distastefulness does not indicate that the overriding purpose of the site was illegal. In fact, the welcome message indicates that the E-group had functions that did not contain illegal visual depictions; it states, inter alia, that members could use the group to "connect with others," "share views and opinions ... without censorship," tell stories, get together socially and share personal information.

The majority's assertion that the overriding purpose of the E-group was illegal is further challenged by the fact that the vast majority of the e-mail messages that Agent Binney received while he monitored the girls12–16 E-group contained text and *did not* contain illegal visual depictions. *See* Binney Aff. at 32. During the two-week period that Agent Binney was a member of the girls12–16 E-group he received a total of 193 e-mails (1) 14 of which contained child pornography; (2) 77 of

---

10. The lack of individualized information is particularly troubling in light of the fact that the government could have obtained additional individualized information about subscribers' activities from Yahoo!. *See Perez,* 247 F.Supp.2d at 483.

11. The majority's statement that "those who view [child pornography] are likely to download and store child pornography" is irrelevant to the probable cause determination in this case because there are absolutely no allegations in the affidavit that Martin "viewed" illegal visual depictions. Op. at 77.

which contained depictions of child erotica; and (3) 102 of which contained only text. Therefore, only 7.25 percent of the 193 e-mails sent to Agent Binney from the girls12–16 E-group contained illegal visual depictions. *Id.* In light of the fact that less than 8 percent of e-mails contained illegal visual depictions, it is purely speculative for the majority to infer that the overriding purpose of the E-group was to trade illegal visual depictions.[12]

Not only is it legal to trade textual depictions and child erotica under the relevant statute, but this Court has also indicated that, as a general matter, possession of child erotica is not relevant to the crime of trading illegal visual depictions. *See United States v. Harvey*, 991 F.2d 981, 994–96 (2d Cir.1993). In *Harvey*, we held that evidence of "simulated child pornography" and child erotica[13] was admissible only because an entrapment defense was raised and because there was additional evidence of defendant's predisposition. We stated that we did not believe that possession of images of child erotica alone "would demonstrate a predisposition to obtain child pornography materials illegally." *Id.; see also Jacobson v. United States*, 503 U.S. 540, 551, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992) ("Evidence of predisposition to do what [is] lawful is not, by itself, sufficient to show predisposition to do what is … illegal ….").

## C. Probable cause through propinquity

Based on the corrected affidavit's allegations that *some* E-group subscribers engaged in illegal activity such as downloading illegal visual depictions, the majority infers that there is a fair probability that all subscribers, including Martin, were also engaging in illegal activity. I agree with the majority that there is no question that the affidavit establishes that *some* E-group subscribers used the E-group for illegal purposes. The illegal activity of some subscribers, standing alone, however, is not sufficient to establish probable cause with respect to Martin as an individual. As the Supreme Court has stated "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *See Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).[14]

The majority's focus on group probabilities runs counter to the well-settled notion that probable cause must be based on par-

---

**12.** Even assuming arguendo that the girls12–16 E-group was wholly dedicated to an illegal purpose and that membership in a wholly illegal organization is a proper basis for probable cause, the affidavit is still insufficient for probable cause purposes because it continues to lack the requisite nexus between Martin and the trading of illegal visual depictions. Furthermore, unlike the case before us, the cases that discuss membership in a wholly illegal organization as a basis for probable cause mostly involve factual scenarios where the crime of conspiracy is at issue and therefore membership in an organization with illegal purposes is highly relevant to the crime alleged. *See, e.g. United States v. Killip*, 819 F.2d 1542, 1550 (10th Cir.1987); *Rubio*, 727 F.2d at 792–93. Conspiracy is not the relevant crime in this case.

**13.** The *Harvey* court does not use the term "child erotica" but describes content that falls within the corrected affidavit's definition of "child erotica." The Court stated that it was referring to a videotape "depicting underage girls on a nudist beach, although that videotape d[id] not depict sexually explicit conduct." 991 F.2d at 994.

**14.** The majority suggests that propinquity to others who are committing a crime is enough. For instance, the majority indicates that Martin is likely to possess illegal visual depictions because child pornography (1) "was available" to subscribers; (2) "was being distributed" to some subscribers; and (3) was being received and downloaded by Agent Binney. Op. at 76.

ticularized facts. *See Ybarra,* 444 U.S. at 91, 100 S.Ct. 338 ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). The corrected affidavit's allegation that Martin was an E-group subscriber is simply not enough without something more that indicates that he actually participated in the illegal activities of the group. *See, e.g., United States v. Brown,* 951 F.2d 999, 1003 (9th Cir.1991) (ruling that individual officer's membership in corrupt police unit was not sufficient for probable cause without further proof that the officer actually participated in illegal activities); *United States v. Rubio,* 727 F.2d 786, 793–94 (9th Cir.1984) (declaring that membership in Hell's Angels, standing alone, is not sufficient for probable cause without particularized allegation that the individual participated in the organization's criminal activity).

### D. Reliance on collector characteristics

The majority exaggerates the relevance of the corrected affidavit's descriptions of "child pornography collectors" (hereafter referred to as "collectors of illegal visual depictions") by improperly inferring that all subscribers to the E-group are collectors of illegal visual depictions.[15] This erroneous inference allows the majority to attribute the characteristics of these collectors-including the possession of illegal visual depictions-to all subscribers of the E-group (and therefore Martin). The affidavit does not support this inference. At no point does the affidavit describe the universe of subscribers to the E-groups, let alone allege that the E-groups' memberships are entirely composed of collectors of illegal visual depictions. It is an inferential fallacy of ancient standing to conclude that, because members of group A (collectors of illegal visual depictions) are likely to be members of group B (subscribers to specified E-groups) then group B is entirely, or even largely composed of, members of group A.

Such reasoning would lead us to conclude that if collectors of illegal visual depictions tend to be men, then men are likely to be collectors of illegal visual depictions. The majority justifies this inference by stating that it is "common sense" that any person who subscribes to one of these E-groups "would more than likely download and possess" illegal visual depictions. Op. at 75. The majority's conclusion that E-group subscribers are likely to be collectors of illegal *visual* depictions is "common sense" only if one studiously ignores the affidavit's extensive description of the text-based functions of the E-group. *Gates,* 462 U.S. at 238, 103 S.Ct. 2317 (indicating that "common sense" determinations must be based on the content set forth in the affidavit).

### III. Conclusion

To conclude, I note that a subscription to a wholly-illegal E-group, which girls 12–16 is not, can arguably serve numerous legal ends. This is true particularly in light of the anonymity and simplicity of subscription. Because the majority ignores the need for individualized assessments, the majority would find probable cause where a concerned parent, seeking to understand potential threats to his children, subscribed to one of these E-groups and neglected to go through the process of

---

**15.** *See Kunen,* 323 F.Supp.2d at 400 ("The basis for concluding that membership may be automatically equated with the status of a collector is questionable, particularly in the absence of the pivotal [misrepresentation by Binney] that every member received every e-mail.") (quoting *Kunen,* Nos. 02–cr–326, 02–cr–1388, 02–cr–734, 02–cr–2965, Mem. and Order at 7–9 (May 23, 2003)).

removing his e-mail address from the list of subscribers until two weeks later. Under the majority's reasoning, there is a substantial likelihood of criminal activity and the government has sufficient information to obtain a search warrant to enter his home. If a researcher, interested in studying the crime of unauthorized downloading of music, subscribes to an E-group that is determined to be dedicated to illegal activity, the government, under the majority's reasoning, has probable cause to search her home without any additional individualized allegations besides her subscription to the E-group.

The majority erroneously attempts to create the required nexus between Martin and illegal activity by appealing to "common sense." While the majority is correct that a magistrate presented with a warrant may "make a practical, common-sense decision," that decision must be based on the "circumstances set forth in the affidavit." *Gates*, 462 U.S. at 238, 103 S.Ct. 2317. Here, the corrected affidavit fails to establish a sufficient nexus between Martin and *illegal* activity. I agree with the majority that we must be mindful of the difference between a probable cause determination and a prima facie violation of Section 2252A. I agree with the majority that there is a need to provide law enforcement with latitude in conducting criminal investigations. I agree that the police found evidence of a crime in Martin's home. Even in light of the above, however, we cannot ignore the requirement of having particularized information about an individual before finding probable cause. Because I cannot join the majority's erosion of the fundamental freedoms enshrined in the Fourth Amendment, I respectfully dissent.